J. C. MOUNT and Burton Edward Ellis,
Appellants,

v.

UNITED STATES of America,
Appellee.

No. 20167.

United States Court of Appeals
Fifth Circuit.

June 18, 1964.

Rehearing Denied July 21, 1964.

Certiorari Denied Nov. 9, 1964.
See 85 S.Ct. 188.

**40**

Charles W. Tessmer, Dallas, Tex., J. C. Mount, Fort Worth, Tex., for appellants.

Barefoot Sanders, U. S. Atty., Dallas, Tex., for appellee.

Before BROWN, WISDOM and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

Mount and Ellis appeal from judgments of conviction entered on jury verdicts of guilty after a joint trial on a one count indictment charging a conspiracy against the laws of the United States consisting of an agreement to defraud by counterfeiting $100 Federal Reserve notes in violation of Title 18 U.S.C.A. § 471,[1] and to buy, sell, transfer, receive and deliver counterfeit $100 Federal Reserve notes with the intent that they be passed, published, and used as genuine in violation of Title 18 U.S.C.A. § 473.[2] They were alleged to have conspired in this regard with Harold Ainsworth, Gus Raymer and Robert L. Keller and the statement of facts will demonstrate the role of each. The conspiracy is alleged to have commenced on or about March 1, 1956 and continued until September 1, 1956.

The overt acts alleged included a conversation between Keller and Ainsworth in Fort Worth, Texas on March 1, 1956 concerning the acquisition of the counterfeit notes; a conversation on June 1, 1956 between Ainsworth and Raymer, a printer, in Odessa, Texas relating to the printing of the notes; and the printing by Raymer in Odessa, on or about June 30, 1956 of approximately $450,000 in counterfeit $100 notes which were delivered to Ainsworth. They also included a conversation on or about July 1, 1956 between Mount and Ellis, appellants here, and Ainsworth concerning monetary shortages in business enterprises in which Mount and Ellis had an interest; and a telephone conversation on August 20, 1956 between Ellis in Fort Worth and Ainsworth in Las Vegas, Nevada. The only material variance between the proof and the overt acts alleged is in the fact that the conversation between Mount, Ellis and Ainsworth took place at an earlier date and prior to the printing of the money.

The evidence as adduced on the trial, when considered in the light most favorable to support the verdict, Glasser v. United States, 1943, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Strauss v. United States, 5 Cir., 1963, 311 F.2d 926 is substantially as follows. A Texas Justice of the Peace investigated the crash of an airplane on August 5, 1956 in Nueces County, Texas. The bodies of the passengers in the plane, Mr. and Mrs. Robert Keller and Henry West, were found at the scene. Nine $100 bills and one $5.00 bill identified as having been on the person of Mr. Keller were found at the scene. Mr. Keller was a Fort Worth lawyer. The plane was headed for Monterey, Mexico. The $100 bills appeared genuine to the Justice of the Peace and to bank personnel in Corpus Christi and to an F.B.I. agent. Secret Service Agents and the Federal Reserve Bank in San Antonio identified the bills as being counterfeit. It is undisputed that they were a part of the batch made by Mr. Raymer, and here in issue.

Mr. Ainsworth testified that he was asked by Mr. Keller on March 1, 1956 to attempt to obtain $450,000 to $500,-

---

1. Section 471:
   "Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

2. Section 473:
   "Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

000 in counterfeit money for clients of his. Keller offered to pay $50,000 for the money and gave Ainsworth an advance of $500. The money was to be used to cover a shortage in an insurance company, and Mr. Keller stated that it would not be put in circulation. Mr. Ainsworth made contact with Gus Raymer, a printer in Odessa, and offered him $25,000 to print the money. Raymer refused and continued to refuse the assiduous and continuous requests of Ainsworth over a period of two to three weeks but was finally persuaded. Ainsworth obtained the necessary paper and either two or three new genuine $100 bills from Keller for Raymer.

This took place in April 1956 and about the middle of May Raymer reported to Ainsworth that he had started the job but had determined not to go through with it. This was reported by Ainsworth to Keller, who in turn told Ainsworth that he had some people he wanted him to meet. Keller made a telephone call in the presence of Ainsworth and asked for a person by the name of "J. C.", talked with that person and then told Ainsworth to go to Ridglea Country Club in Fort Worth and ask for J. C. Mount.

Ainsworth proceeded to the Ridglea Country Club, asked for J. C. Mount, was shown to his table, and there met Mount and Burton Edward Ellis, the other appellant herein. Mount did most of the talking, explaining to Ainsworth that they were in a difficult position as to examinations coming up on Texas insurance companies, that they had assets but not in the form of cash, and that they needed some time. They stated to Ainsworth that they would appreciate any help or cooperation on his part through Keller to help them straighten out their difficulty. Counterfeiting as such was not mentioned.

Ainsworth then returned to Odessa and again contacted Raymer, but Raymer remained adamant in his refusal to print the money. This was reported to Keller who said he would send someone to Odessa to persuade Keller. Later that day J. C. Mount and Burton Edward Ellis arrived in Odessa by private plane. Ainsworth and Ellis went to see Raymer at his home where Ellis was introduced to Mr. and Mrs. Raymer under another name. Ellis told Mr. Raymer that he needed the counterfeit money to cover a shortage in an insurance company but that it would not be placed in circulation. Ainsworth then took Mount and Ellis to the airport, and the next day again saw Raymer who agreed to go forward with the printing.

The job was finished during June 1956 and Ainsworth picked the money up late one night, offered to pay Raymer the $25,000, which was refused, returned to Fort Worth and turned the money over to Keller. The $25,000 was returned to Keller at the time save for $2,000 which Ainsworth kept for himself for expenses.

Ainsworth testified that he saw Mount and Ellis a considerable number of times during the summer of 1956, and that he received a telephone call from Ellis while in Las Vegas in August 1956. The substance of the call was a report from Ellis that some Federal people were inquiring around Fort Worth about some of the business that Ainsworth had with Keller and that "the business" had been found in an airplane that Keller was killed in. Ellis sought the advice of Ainsworth as to what they should do with "it". Ainsworth told him that it should be burned. He immediately returned by automobile to Fort Worth, and there met Mount who stated that the business that had been discussed over the telephone between Ainsworth and Ellis "was all taken care of".

Raymer substantiated the testimony of Ainsworth and added that Ellis was introduced to him at his home as Bill Edwards. He made a deliberate error in the counterfeiting in that the serial numbers were not lined up in the normal way. He had burned the plates which had been used to print the money. He identified the nine $100 bills taken from the body of Keller as being of the group made by him. Mrs. Raymer testified

42

that she heard Ellis ask Mr. Raymer to print the counterfeit notes.

There was other testimony regarding $47,000 in counterfeit $100 bills out of this same batch being found in or near a creek bed in the vicinity of Weatherford, Texas, some fifty miles from Fort Worth. Most of it was found by a farmer who turned it in to a bank. Some of these bills showed evidence of an attempted burning.[3] Ainsworth testified that he had another conversation with Mount in November 1956 at the Ridglea Country Club wherein he asked Mount if the money that was found near Weatherford, the finding of which had been publicized, had any relation to what he said he had burned. Mr. Mount replied that it did and that he had not had time to burn it all and that he had taken it and buried it in a tree near Weatherford.

A Secret Service Agent testified in regard to an interview which he had with Mount on August 17, 1956 at the Guaranty Abstract Company in Fort Worth. Mr. Mount was president of the company and Keller was its secretary and treasurer. Mount stated to him that Keller formerly had an office at the abstract company but had moved. They were business associates because of Keller having helped Mount purchase the company.

There was other testimony with regard to a fire in the office of Mount on August 20, 1956. The fire was discovered because of smoke entering a shoe store under the office of Mount and someone in the shoe store sounded the alarm. Mount met the fire captain when the engine arrived at the premises and told him he had had a fire in a wastebasket which caused the smoke but that the fire was out. The fire captain went into Mount's office and noticed that the wastebasket was covered with a coat, but he did not remove the coat or in any way examine the contents of the wastebasket.

■ Mr. Mount, a former lawyer, represented himself on the trial while Mr. Ellis was represented by counsel of his choice. Their briefs on appeal are filed jointly, and assign a multitude of errors, some of which are worthy of more than per curiam consideration. In passing, and by way of elimination, we may say that one that does not rise to this level is based on the contention that the court erred in failing to grant motions for judgments of acquittal. A mere reading of the statement of facts demonstrates the sufficiency of the evidence to warrant convictions. The others, in the main, consist of questions involving the admissibility of evidence, errors of omission and commission in the charge, claimed misconduct on the part of the prosecutor in the trial, and whether the court erred in failing to dismiss the indictment or in the imposition of Mount's sentence. In sum, we conclude that there is no merit in any of the errors assigned, and affirm.

I.

The argument that the court erred in overruling the motion to dismiss the indictment is premised on the novel proposition that the United States was not to be defrauded in that the money was not to be put in circulation, but used only to cover an insurance shortage.

■ Under the indictment it was not necessary to allege that the United States or anyone else was to be defrauded. The indictment alleged that the parties conspired, knowingly and wilfully, to defraud by counterfeiting, in violation of § 471, supra, and that they intended to pass the notes as genuine in violation of § 473, supra. This old ground was covered in Bachrack v. United States, 5 Cir., 1935, 75 F.2d 824, and is without merit. There was no transgression of the criteria enunciated in Van Liew v. United States, 5 Cir., 1963, 321 F.2d 664. And with respect to alleging intent, Mr. Justice Holmes pointed out in

3. The balance of the batch made by Mr. Raymer, amounting to some $400,000, was not accounted for on the trial.

Frohwerk v. United States, 1918, 249 U. S. 204, 39 S.Ct. 249, 63 L.Ed. 561, that:

> " * * * intent to accomplish an object cannot be alleged more clearly than by stating that the parties conspired to accomplish it."

## II.

The error based on the alleged misconduct of the prosecutor centers on an exchange between counsel for appellant Ellis and the United States Attorney. The conduct of counsel for Ellis was the subject matter of a contempt citation and was before this court in the case of Tessmer v. United States, 5 Cir., 1964, 328 F.2d 306. The substance of his conduct as it relates to this assignment of error is contained in the contempt citation set out in the report of that case.[4] Counsel for the second time referred to the "hung jury last April" in the presence of the jury whereupon the United States Attorney excepted and invited counsel to disclose the ballot of said hung jury. The pertinent colloquy is set out in the margin.[5]

██ No objection whatever on the part of Ellis was lodged. Appellant Mount was not a party to this exchange, and he made no objection until the following day when he filed a motion that the ballot of the hung jury be disclosed, or in the alternative, that a mistrial be declared. There is no suggestion of record that the ballot was known. The statement by the United States Attorney was in the nature of puffing, done in an effort to protect himself from the tactics adopted by defense counsel. There was no showing that either the colloquy between counsel with respect to the hung jury, or the reprimand by the court at the time were harmful to Mr. Mount. There was thus no error in denying the motion for mistrial, even assuming, *arguendo*, it to have been timely made. As to Ellis, the remark by the United States Attorney was provoked by his counsel and did not constitute error in our judgment. Certainly it did not constitute plain error under the circumstances. Rule 52(b), F.R.Crim.P. Cf. Ochoa v. United States, 9 Cir., 1948, 167 F.2d 341. Neither can we say that the reprimand of counsel was imputed to either Ellis or Mount. It was a matter strictly between counsel and the court. See the case of Baiocchi v. United States, 5 Cir., 1964, 333 F.2d 32, where this court considered in some depth the question of an improper remark by a prosecutor which was provoked by defense counsel. However, by way of admonition, we do not commend the rebuttal tactics of the prosecutor here to general use. The best practice is to permit the court to keep the trial in proper bounds.

4. 328 F.2d at p. 307:
   "The defendant's counsel, each time he made and repeated the hung jury disclosure, did so designedly in an effort to serve the chances of a favorable fate for his client, but with present knowledge that what he did was fraught with potential prejudice to the due administration of the law, and his action was done with the prospect in mind that such hung jury factor might well be conducive, if not to an acquittal, at least to another hung jury and further delay, or maybe in time a dismissal by the Government. The means adopted to pursue said desired end, however, are deemed beyond proper lawyer zeal. The defendant's counsel, as an able and experienced lawyer, knew that if he had sought beforehand to have the Judge pass on the propriety of making hung jury comments, it would have been forbidden by the Court."

5. "MR. TESSMER: No, sir. My motion goes to this: that this defendant was supposed to be sentenced along with Raymer after the hung jury last April.
   "MR. SANDERS: Now, if Your Honor please, we except to the statement about the hung jury, unless he wants to tell this Jury and this Court what the ballot was. That was a highly improper statement and we move that the Jury be instructed to disregard it.
   "THE COURT: Yes, it was improper.
   "MR. SANDERS: It is the second time.
   "THE COURT: And I will come back to that with Counsel later more privately. I think it was inexcusable * * *"

## III.

Four of the assignments of error rest on alleged improper admission of evidence. It is claimed that hearsay declarations of co-conspirators after termination of the conspiracy were inadmissible. This had to do with the testimony regarding the Fort Worth-Las Vegas telephone conversation between Ellis and Ainsworth and the subsequent conversations in August and November between Mount and Ainsworth. The theory of appellants is that the conspiracy ended with the direction in the telephone conversation between Ellis and Ainsworth that the counterfeit money be burned, and that this telephone conversation as well as the subsequent conversations between Mount and Ellis were related to a separate conspiracy to destroy the counterfeit money, and thus were inadmissible in connection with the conspiracy charged. The long and the short of this stock argument is that these conversations all had to do with the conspiracy charged. The money was still in existence; trouble was near at hand, and care was being taken to avoid detection. For aught that appears the conspiracy was continuing. Keller had a part of the money, and Mount another part. Some was hidden and found as late as November. Most was not accounted for on the trial. All save the November conversation were within the period of the conspiracy charged.

It is enough to say that this evidence was in proof of acts relevant to prove the conspiracy and was therefore admissible, and it is unnecessary to consider the additional argument of the prosecution that it was in the nature of declarations in furtherance of the conspiracy. Lutwak v. United States, 1952, 344 U.S. 604, 73 S.Ct. 481, 97 L. Ed. 593. This is not a case of declarations of a conspirator being admitted to bind a co-conspirator after the conspiracy has ended, or evidence admitted in proof of a separate conspiracy to conceal the fraud. Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790; and Grunewald v. United States, 1957, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344. This is likewise true as to the November conversation between Mount and Ainsworth with respect to the money found at Weatherford, and as to the evidence of the fire in Mount's office in August.

There was no error in admitting the evidence of conversations between Keller and Ainsworth with respect to obtaining the money, and Ainsworth and Raymer with respect to printing the money during which neither Mount nor Ellis were present. This was evidence of the conspiracy and it was only necessary to tie Mount and Ellis to the conspiracy. This complaint, in substance, has to do with order of proof, and whether this evidence was to be admitted prior to the evidence connecting appellants to the conspiracy was a matter for the discretion of the trial court. Strauss v. United States, supra. Moreover, appellants stated in oral argument before this court that this assignment of error was waived by reason of their failure to request limiting instructions.

Appellants also contend that the court erred in admitting narrative declarations of co-conspirators. There is no substance whatever to this assignment of error.

## IV.

The charge as given, taken as a whole, was fair and adjusted to the evidence. The contentions of appellants that it had the effect of directing a verdict as to the fact of the conspiracy, or that it was not made clear that the jury could return a verdict for either or both of appellants, or that it interrelated guilt between appellants are each lacking in merit. The same is true with respect to the contention that proof beyond a reasonable doubt of at least one overt act within the jurisdiction of the court should have been required and that the burden of proof as to the overt acts was shifted to appellants.

■ It is urged that the court erred in refusing to give certain requested charges in the nature of affirmative defenses. We assume but do not decide, that requests were made in terms adequate to warrant appellants' taking this position. Their position stems from and rests on an argument that the posture of the proof in the case showed that they entered into a buyer-seller relationship with Raymer and Ainsworth, and that they could have been guilty of substantive offenses under §§ 471 and 473 without having been involved in the conspiracy. Lack of specific intent is also said to constitute an affirmative defense. It is sufficient to say the first two are without support in the evidence, and lack of intent was not an affirmative defense under the circumstances of this case. It is to be noted that the charge on intent, with the burden of proof being cast on the prosecution, was full and complete.

## V.

■ Lastly, appellant Mount is of the opinion that the court erred in imposing a sentence of two years on him. The maximum sentence that could have been imposed was five years, 18 U.S.C.A. § 371. Ellis received the same sentence. But, and here is the hub of the complaint, Ainsworth and Raymer, both of whom pleaded guilty, received, respectively, only eighteen months, and a two year suspended sentence. Mount made a rather strong showing that he had been rehabilitated to a useful place in society after having served prison terms, federal and state, for other offenses committed in the year 1956, for him a fatal year. However, the sentence imposed was within the allowable limits and we are without power to modify it. Herman v. United States, 5 Cir., 1961, 289 F.2d 362. And mercy, in the beginning and after this decision is a question for the District Court. Rule 35, F.R.Crim.P., and see Sullivan v. United States, 5 Cir., 1963, 317 F.2d 101.

Affirmed.