**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Edward JOHNSON, Defendant-
Appellant.**

No. 30656.

United States Court of Appeals,
Fifth Circuit.

March 20, 1973.

Fred L. Banks, Jr., Jackson, Miss., Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., for defendant-appellant.

Robert E. Hauberg, U. S. Atty., E. Donald Strange, Daniel E. Lynn, Joseph E. Brown, Jr., Asst. U. S. Attys., Jackson, Miss., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, GEWIN and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The only thing unusual about this direct criminal appeal from conviction for failing to obey a lawful order of a Selective Service Board (a violation of 50 U.S.C.A. App. § 462), is that the Defendant here overcame the well-established presumption of regularity and validity normally attaching to official acts of Selective Service Boards[1] and created a jury issue where usually there is none—and in fact, there really was none in this case (see note 21, *infra*). Since the Government was not relying exclusively on the presumption and offered other probative evidence that the Defendant had not been ordered to alternative service in lieu of induction into the Armed Services out of sequence, and because we reject other arguments less strenuously urged by the Defendant, we affirm the judgment of conviction based on a jury finding of guilt, but remand for resentencing.

*No Show At Jackson*

Robert Edward Johnson was classified I–O (conscientious objector not available for military duty) by Selective Service Local Board No. 23 of Grenada, Mississippi. Pursuant to 50 U.S.C.A. App. § 456(j), and as an alternative to military service, he was ordered[2] by his Board to work at the Mississippi State Hospital in Whitfield, Mississippi. His work at Mississippi State Hospital proved unsatisfactory and, accordingly, he was dismissed. Subsequently he was

---

1. Cf. Oestereich v. Selective Service Board, 1968, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402; Wells v. United States, 5 Cir., 1946, 158 F.2d 932, cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1276; Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Yates v. United States, 1 Cir., 1968, 404 F.2d 462, rehearing denied, 1969, 407 F.2d 50.

2. The order, dated September 20, 1967, stated that he was to present himself for alternative service on October 4, 1967.

reassigned to Rush Memorial Hospital in Meridian, Mississippi, and when employment there was terminated for poor performance, the State Director of Selective Service ordered him transferred to the University of Mississippi Medical Center in Jackson, Mississippi. On January 31, 1969, after he had served some 16 months of his two-year obligation, Johnson failed to report to the University of Mississippi Medical Center as ordered by the State Director. Thereafter he was prosecuted for a violation of 50 U.S.C.A. App. § 462, by an indictment charging that he did "knowingly, wilfully, unlawfully and feloniously fail, neglect and refuse to" obey the orders of his local Selective Service Board.[3] From a jury verdict of guilty and a five-year sentence, this appeal has been taken.

### The Indictment Sufficeth

Johnson first claims that the indictment was fatally defective for two reasons.

### Specificity

First, Johnson protests that the indictment did not measure up to requisite standards of specificity. Relying on Lowenburg v. United States, 10 Cir., 1946, 156 F.2d 22 and United States v. Farinas, S.D.N.Y., 1969, 299 F.Supp. 852, he argues that the indictment was insufficient because it did not allege specific duties he failed to perform.

Assuming, without deciding, that we would follow these decisions of sister Circuits, these cases simply do not touch this record. In *Lowenburg*, the indictment alleged no specific order which had been disobeyed, but rather, only the general refusal of Defendant "to work and perform duties." Actually, Lowenburg was tried specifically for refusing to burn stumps and remove dirt therefrom. The Court held that the indictment was wholly insufficient to apprise Defendant that that specific act was to be the subject of prosecution.

Likewise in *Farinas,* the indictment alleged that Defendant "did fail, neglect

and refuse to obey the orders of representatives of the Armed Forces of the United States * * *." Again, the specific order disobeyed was not set out and the indictment was held fatally deficient for that reason.

Unlike those cases, the indictment here specifies the particular criminal act for which Defendant was to be tried. The indictment alleged that "on or about January 31, 1969" Johnson did "knowingly, wilfully, unlawfully and feloniously fail, neglect, and refuse to *report for and remain in employment* with the University of Mississippi Medical Center at Jackson, Mississippi, for twenty-four consecutive months or until such time as released or transferred by proper authority as ordered * * *." (Emphasis supplied). Clearly that indictment fully informed the Defendant of the specific act for which criminal liability was sought to be imposed—complete with time, place and circumstance.

If a precedent need be marshaled, United States v. Wagoner, 7 Cir., 1944, 143 F.2d 1, cert. denied, 323 U.S. 730, 65 S.Ct. 67, 89 L.Ed. 586 is more than enough. In *Wagoner* the indictment alleged that the Defendant "unlawfully, knowingly, wilfully, and feloniously failed and refused to present himself for and submit to registration * * *." This indictment was held to state a "clear, definite, and general offense," and to be legally sufficient to withstand a due process challenge. If the word "registration" in that indictment is changed to the phrase "civilian employment at Mississippi State Hospital," the indictment here becomes virtually identical.

### Punishable Offense

Johnson's second attack on the indictment is that no offense under the statute was made out since the order violated was not that of the local Selective Service Board, as alleged, but rather an order of the State Director of Selective Service.

---

3. The specific order of the Board allegedly violated is discussed in text, *infra*.

That exact contention was before this Court and decided in Davis v. United States, 5 Cir., 1968, 400 F.2d 577, cert. denied, 394 U.S. 908, 89 S.Ct. 1019, 22 L.Ed.2d 219. Although Johnson strenuously urges that the *Davis* case is not applicable here, we disagree.

The Order To Report For Civilian Work issued by Local Board No. 23 to Johnson specifically directed "you are ordered to report for employment pursuant to the instructions of the local board, to remain in employment for twenty-four consecutive months or *until such time as you are released or transferred by proper authority.*" (Emphasis supplied.) As we pointed out *Davis,* the State Director had *authority* to transfer Appellant to other civilian work after his discharge from the Mississippi State Hospital under Selective Service System Local Board Memorandum No. 64 issued March 1, 1962, Section 8(b). Thus, on the *Davis* approach, the failure to obey a lawful command of the State Director—a command which the Director was authorized to issue—was simultaneously a failure to obey the order of the draft board, as charged in the indictment.

This indictment specifying precise dates and identifying particular places (University of Mississippi Medical Center) satisfied the underlying requirements that it "inform the accused of the nature of the charges against him, with such specificity and particularity that the accused is enabled to undertake and prepare an adequate defense." United States v. Levinson, 6 Cir., 1968, 405 F.2d 971, 977; United States

v. Debrow, 1953, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92; Hagner v. United States, 1932, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861. And attributing the State Director's order to the Board related to its legal effect and did not mislead the Defendant as to the charges he faced.

### Was Order Out of Order?

Johnson next asserts that his conviction should be reversed because the Government did not prove that he was ordered to report for alternative service in the proper sequence. The issue considered here has never been before this Court in precisely the form presented in this particular appeal.

We observe initially that this is a *criminal* prosecution. Johnson has been sentenced to five years in prison. It is an obvious rudiment of due process that in a criminal prosecution every essential element of the offense must be proved beyond a reasonable doubt.[4]

Implicit in the charge that Defendant failed to obey an order of the local draft board is the allegation that the underlying order was lawful. Johnson could not be punished for disobeying an unlawful order of the Board.[5] Thus, since Johnson cannot be punished unless he failed to obey a *lawful* order of the Board, the lawfulness of the order is necessarily an element of the crime charged.[6]

The order to report for alternative service was not lawful if it was issued contrary to controlling rules and regulations governing the Selective Service System.[7] One of these—a particular-

---

4. Newsom v. United States, 5 Cir., 1964, 335 F.2d 237; Colt v. United States, 5 Cir., 1946, 158 F.2d 641; A.L.I. Model Penal Code, § 1.12(1) (Proposed Official Draft 1962).

5. Franks v. United States, 9 Cir., 1954, 216 F.2d 266; United States v. Atherton, 9 Cir., 1970, 430 F.2d 741; Goetz v. United States, 9 Cir., 1954, 216 F.2d 270; Palmer v. United States, 9 Cir., 1968, 401 F.2d 226.

6. Cf. United States v. Lybrand, E.D.N.Y., 1967, 279 F.Supp. 74, 81–82.

7. Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567; Carson v. United States, 5 Cir., 1969, 411 F.2d 631, cert. denied 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119; Olvera v. United States, 5 Cir., 1955, 223 F.2d 880; Imboden v. United States, 6 Cir., 1952, 194 F.2d 508, cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357.

ly important one—sets forth the order in which Selective Service registrants are to be inducted or ordered to alternative duty in lieu of military service. 32 C.F. R. § 1660.20(a)(b)(c)(d)[8] and § 1631.7 (a).[9] Adherence to the proper order of

The *Olvera* case, coming out of this Circuit, provides particularly strong language to this effect:

"It is of the essence of the validity of board orders and of the crime of disobeying them that all procedural requirements be strictly and faithfully followed, and that a showing of failure to follow them with such strictness and fidelity will invalidate the order of the board and a conviction based thereon." 223 F.2d at 882.

8. § 1660.20 Determination of type of civilian work to be performed and order by the local board to perform such work.

(a) When a registrant in Class I–O has been found qualified for service in the Armed Forces after his armed forces physical examination or when such a registrant has failed to report for or to submit to armed forces physical examination, he shall, within ten days after a Statement of Acceptability (DD Form No. 62) has been mailed to him by the local board or within ten days after he has failed to report for or submit to armed forces physical examination, submit to the local board three types of civilian work contributing to the maintenance of the national health, safety, or interest as defined in section 1660.1, which he is qualified to do and which he offers to perform in lieu of induction into the Armed Forces. If the local board deems any one of these types of work to be appropriate, it will order the registrant to perform such work, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O, unless he has volunteered for such work.

(b) If the registrant fails to submit to the local board types of work which he offers to perform, or if the local board finds that none of the types of work submitted by the registrant is appropriate, the local board shall submit to the registrant by letter three types of civilian work contributing to the maintenance of the national health, safety, or interest as defined in § 1660.1 which it deems appropriate for the registrant to perform in lieu of induction. The registrant, within ten days after such letter is mailed to him by the local board, shall file with the board a statement that he either offers to perform one of the types of work submitted by the board, or that he does not offer to

perform any of such types of work. If the registrant offers to perform any one of the three types of work, he shall be ordered by the local board to perform such work in lieu of induction, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O unless he has volunteered for such work.

(c) If the local board and the registrant are unable to agree upon a type of civilian work which should be performed by the registrant in lieu of induction the State Director of Selective Service for the State in which the local board is located, or the representative of such State Director, appointed by him for the purpose, shall meet with the local board and the registrant and offer his assistance in reaching an agreement. The local board shall mail to the registrant a notice of the time and place of this meeting at least 10 days before the date of the meeting. If agreement is reached at this meeting, the registrant shall be ordered by the local board to perform work in lieu of induction in accordance with such agreement, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O, unless he has volunteered for such work.

(d) If, after the meeting referred to in paragraph (c) of this section, the local board and the registrant are still unable to agree upon a type of civilian work which should be performed by the registrant in lieu of induction, the local board, with the approval of the Director of Selective Service, shall order the registrant to report for civilian work contributing to the maintenance of the national health, safety, or interest as defined in § 1660.1 which it deems appropriate, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O, unless he was volunteered for such work.

9. § 1631.7 Action by local board upon receipt of notice of call.

(a) Each local board, upon receiving a Notice of Call on Local Board (SSS Form No. 201) from the State Director of Selective Service (1) for a specified number of men to be delivered for induction, or (2) for a specified number

call is of more than mere technical importance. Manifestly, it affects substantial rights of the registrants. United States v. Baker, 9 Cir., 1969, 416 F.2d 202, 204. Moreover, Congress, the President, and the American people have expressed clear intent that the draft, when utilized, be conducted with as much servitude to objectivity as is humanly possible.[10] We deem it of particular significance, for example, that Congress affirmatively mandated and reiterated in each of the four paragraphs of 32 C.F.R. § 1660.20 that "such order [to alterna-

tive service] shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O, unless he has volunteered for such work." See note 8, *supra*. With possible consequences to those selected so awful and the opportunities for even good faith but inadvertent exercise of subjective choices undeniably present, it is certainly essential that objective standards spelled out in the law be scrupulously respected.

The order of call—as it stood in 1967[11]—required that (i) delinquents

of men in a medical, dental, or allied specialist category to be delivered for induction, shall select and order to report for induction the number of men required to fill the call from among its registrants who have been classified in Class I–A and Class I–A–O and have been found acceptable for service in the Armed Forces and to whom the local board has mailed a Statement of Acceptability (DD Form No. 62) at least 21 days before the date fixed for induction: *Provided*, That a registrant classified in Class I–A or Class I–A–O who is a delinquent may be selected and ordered to report for induction to fill an induction call notwithstanding the fact that he has not been found acceptable for service in the Armed Forces and has not been mailed a Statement of Acceptability (DD Form No. 62): *And provided further*, That a registrant classified in Class I–A or Class I–A–O who has volunteered for induction may, if an appeal is not pending in his case and the period during which an appeal may be taken has expired, be selected and ordered to report for induction notwithstanding the fact that he has not been found acceptable for service in the Armed Forces and regardless of whether or not a Statement of Acceptability (DD Form No. 62) has been mailed to him. Such registrants, including those in a medical, dental, or allied specialist category, shall be selected and ordered to report for induction in the following order:

(1) Delinquents who have attained the age of 19 years in the order of their dates of birth with the oldest being selected first.

(2) Volunteers who have not attained the age of 26 years in the sequence in which they have volunteered for induction.

(3) Nonvolunteers who have attained the age of 19 years and have not

attained the age of 26 years and who (A) do not have a wife with whom they maintain a bona fide family relationship in their homes, in the order of their dates of birth with the oldest being selected first, or (B) have a wife whom they married after the effective date of this amended subparagraph and with whom they maintain a bona fide family relationship in their homes, in the order of their dates of birth with the oldest being selected first.

(4) Nonvolunteers who have attained the age of 19 years and have not attained the age of 26 years and who have a wife whom they married on or before the effective date of this amended subparagraph and with whom they maintain a bona fide family relationship in their homes, in the order of their dates of birth with the oldest being selected first.

(5) Nonvolunteers who have attained the age of 26 years in the order of their dates of birth with the youngest being selected first.

(6) Nonvolunteers who have attained the age of 18 years and 6 months and who have not attained the age of 19 years in the order of their dates of birth with the oldest being selected first. In selecting registrants in the order of their dates of birth, if two or more registrants have the same date of birth they shall, as among themselves, be selected in alphabetical order.

10. See authorities and discussion in United States v. Lybrand, *supra*, 279 F.Supp. at 78–79.

11. In 1967, Selective Service regulations provided for drafting older registrants first. That order was later changed, of course, and younger men were being selected first until the suspension of the draft in January, 1973.

(oldest first) be called to report first, (ii) volunteers (in the order in which they volunteered) be selected next, and (iii) unmarried nonvolunteers (ages 19 through 26) be called next "in the order of their dates of birth with the oldest being selected first." We have to determine what has been shown with respect to this sequence in the present case.

▉ As a necessary general rule, the element of lawfulness of an order is established by a presumption that the local Board performed its duty in a regular and therefore legally valid manner. Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Lowe v. United States, 5 Cir., 1968, 389 F.2d 51; Pique v. United States, 5 Cir., 1968, 389 F.2d 765; Campbell v. United States, 5 Cir., 1968, 396 F.2d 1. The presumption derives from the administrative necessity for such a rule.[12] Quite obviously it would be completely unworkable to require the Government to present detailed affirmative proof in every case proving not only the technical validity of every act involved in or leading to the order in question, but the underlying validity of the structure of the local Board itself. The rule is born of necessity and a recognition of experience-proved assurance that the Board can be relied upon to discharge its duties with complete fairness and careful adherence to the regulations. Thus, in the normal case it is quite permissible to presume compliance with the predicating regulations and thereby establish that element of the offense charged.[13]

▉ On the other hand, there is always the possibility that either by mistake or in very rare and isolated cases by capricious and arbitrary discrimination, the Board may undermine the validity of the order to service by a failure to comply with Selective Service law and regulations.[14] In the usual case, absent a showing that either of these elements is likely present (mistake or design), the Government need not affirmatively demonstrate the lawfulness of the order to service—that element is established by the presumption. But where the registrant is able to show a substantial likelihood that the order to service was irregular, and thereby overcome the presumption, that element of the offense is in issue and the validity of the order must be established beyond a reasonable doubt.

### Adding Opportunity And Motive

▉ Recognizing that once the presumption is dissipated by probative evidence to the contrary, and that once such evidence had been tendered, the presumption standing alone would no longer be sufficient to convict, Johnson set out to demonstrate a substantial likelihood that his order to call was irregular. Specifically, the strategy was to show a *substantial likelihood* that the Board, motivated in part at least by a desire to terminate Johnson's persistent civil rights activities in Grenada, had acted with undue haste to remove him from the community, ordering him to alternate service before another registrant who should have gone first.

We can only conclude, from the jury's pronouncement of guilty, after full and proper instruction on the issue of order of call that the strategy failed.

### Step One—The Board's Awareness

The first step in this approach was to demonstrate the Board's keen aware-

12. Yates v. United States, *supra* note 1; Keene v. United States, 10 Cir., 1959, 266 F.2d 378, 380.

13. See, Oestereich v. Selective Service Board, *supra.*

14. "In a large draft board area perfect proof that no person exists who should have been drafted before the defendant but was not, would be improbable. On the other hand, there exists the possibility that capricious or arbitrary action was taken by a local board; a defendant has little opportunity to obtain proof of discrimination; and there is no chance or procedure to review this issue before the agency. There ought, therefore, to be a means of exerting constant pressure on the local boards to adhere faithfully to the order of call regulation."
Yates v. United States, *supra*, 404 F.2d at 466.

ness of and reaction to certain civil rights activities in which Johnson was involved. Johnson had been a civil rights activist in Grenada.[15] As putative leader of the Black people there, his vigorous participation in the civil rights movement had been well-publicized. He had brought and successfully maintained a civil rights action against various Judges in Grenada which resulted in an injunction prohibiting theretofore common systematic exclusion of Blacks from petit and grand jury panels. In late January and early February 1967 Johnson had been involved in a controversial courtroom incident with manifest civil rights implications which was only recently finally resolved when the United States Supreme Court summarily reversed his resultant contempt conviction.[16] And all of this was "town talk" and "in all of the papers."

In this context, certain documents in Johnson's Selective Service file were presented to the jury. The first of these was a letter from the Executive Secretary of Local Board 23 to the State Director of Selective Service: "Colonel Weeks, this registrant is one of the leaders here at Granada who has been working as a civil rights worker all summer and has been out of one thing into another.[17] You can see who receives copies of his letters * * *" [18] (referring to various national civil rights leaders, including Dr. Martin Luther King, Jr.). The second item suggesting that the Board may have been desirous of removing Johnson from the local scene with the greatest dispatch was another letter from the Executive Secretary. In March of 1967, when the Selective Service was drafting no one younger than 19½ years the Executive Secretary wrote the State Director for permission to order Johnson to service that next month—despite the fact that Johnson was then only 18½ years old and Selective Service regulations then specifically prohibited taking anyone younger than 19. The Executive Secretary was also concerned that Johnson had not been reclassified from I–O into a draft-eligible class and stressed, in her letter, that Appellant had "NOT" been re-classified into I–A or I–A–O.[19]

---

15. Clearly the status of being a civil rights worker affords no special status under the Selective Service System. On the other hand, it would be less than juridically perceptive not to recognize the possibility of the Selective Service System being used to suppress or punish unpopular political activity. The Courts have therefore been particularly alert and diligent whenever sensitive and vulnerable First Amendment civil rights have been involved in Selective Service cases. See, e. g., *Oestereich; Greer, supra*, Wolff v. Selective Service Board No. 16, 2 Cir., 1967, 372 F.2d 817; Gutknecht v. United States, 1970, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532; Wills v. United States, 9 Cir., 1967, 384 F.2d 943; National Student Associated v. Hershey, 1969, 134 U.S.App.D.C. 56, 412 F.2d 1103; United States v. Spock, 1 Cir., 1969, 416 F.2d 165.

16. Johnson v. Mississippi, 1971, 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423.

17. Cf. United States v. Cabbage, 6 Cir., 1970, 430 F.2d 1037, in which the I–A classification of the Defendant was held to be unlawful because the Selective Service file on him contained an irrelevant, prejudicial and impermissible summary of an FBI report charging that he was trying to organize black power followers and was being closely watched by the FBI.

18. The Executive Secretary was closely cross-examined on the meaning of each of these letters, but was unable to recall what she may have had in mind or what was the purpose of the quoted passages. At one point she could only comment "I'm sure it was of no importance," explaining the reference to Johnson's civil rights activities and their relation to Selective Service considerations.

19. There is a suggestion that in these actions the secretary was violating 32 C.F.R. § 1622.1(d): "In classifying a registrant there shall be no discrimination for or against him because of his race, creed, or color, or because of his membership or activity in any labor, political, religious, or other organization. Each such registrant shall receive equal justice." It is not the classification of Johnson, however, which is here called in question, but rather the subsequent order to report to alternative civilian service. Johnson was

■ Once Johnson had been ordered to alternative service and he had been securely removed from the Grenada civil rights struggle, the Executive Secretary expressed her relief in a letter to the State Director concluding that this is "another one behind us, I hope." [20]

*Step Two—The Older Registrant*

Having established by the probative evidence the *possibility* that the Board was overly anxious to remove Johnson from the local scene—and clearly this evidence only tentatively suggested this possibility and in no way conclusively demonstrated improper action of the Board—the defense proceeded to solicit information about specific registrants. The highlight of the defense came when the Executive Secretary, during cross-examination, testified that there was at least one other registrant—a Mr. Dick-

man—who was classified I–O by Local Board No. 23, was older than Johnson, had taken (and presumedly passed) his physical examination, and yet was passed over when Johnson was ordered to alternative service. The Dickman evidence is skeletal and inconclusive, but the crucial testimony was as follows:

"Q. And he was older than the Defendant?

A. That's right.

Q. And under the regulations—

A. He went for a physical examination.

Q. Under the regulations he should have been called ahead of the Defendant, isn't that right?

A. I would have to check records but he took his physical examination." [21]

---

eventually classified I–O, as he had requested so the alleged racial or ideological bias did not have any effect.

20. Personal interest, bias or prejudice, may disqualify a local board member from participating in a particular case. See Haven v. United States, 9 Cir., 1968, 403 F.2d 384, 387, cert. dismissed, 1969, 393 U.S. 1114, 89 S.Ct. 926, 22 L.Ed.2d 120; United States v. Fielder, E.D.Mich., 1954, 136 F.Supp. 745; United States v. Cabbage, *supra*, note 17 (in which the reclassification of the Defendant was enjoined until the Selective Service Board reconstituted itself in accordance with the applicable regulations).

21. As it turns out, Dickman was not passed over in the September call as Johnson attempted to show. In the first place, the Executive Secretary testified that Dickman was classified into Class I–O on August 22, 1967.

The Regulation setting forth the order of call states that *"such* registrants * * * shall be selected and ordered to report for induction in the following order: * * * *"* (emphasis added). The "such" refers to registrants "who have been classified in Class I–A and Class I–A–O [and Class I–O] and have been found acceptable for service in the Armed Forces and *to whom the local board has mailed a statement of acceptability* (DD Form No. 62) at least 21 days before the date fixed for induction * * * *"* 32 C.F.R. § 1631.7(a) (em-

phasis added). Additionally, the order to report for a physical examination would have to be mailed to the registrant and the results of the examination would have to be forwarded to the Board. In view of these facts it would have been virtually impossible for a registrant classified on August 22 to have been mailed a Statement of Acceptability at least 21 days before the succeeding September 20.

More conclusively, it turns out that the Executive Secretary's above quoted testimony about Dickman was mistaken. In post submission review of the record, the Court noticed potentially significant typographical errors in the transcript and remanded the case to the District Court for certification of a corrected record. To substantiate its version of what was actually said the Government introduced into the record the list of conscientious objectors to which the Executive Secretary was referring during her testimony. Our appellate examination of that document, now before us as a part of the record on appeal, reveals that there were *five* Dickmans on the register of conscientious objectors of Local Board No. 23 and the Secretary, in apparent confusion from the rigorous cross-examination, misread the log. The Dickman who was older than Appellant (Daniel E.) had been classified into IV–D on July 20, 1967, well before the time Johnson was ordered to report for alternate service. The Dickman who was classified into I–O on August 22,

On the other hand, the Executive Secretary had repeatedly testified that Johnson was not taken out of sequence and that no other *qualified registrant in the available pool* had been passed over when Johnson was ordered to report for alternative service.

"Q. As I recall my question was at the time this Defendant was sent his order to report for work on September 20th, 1967 was he call in due course along with other registrants in that age group?

\*   \*   \*   \*   \*   \*

A. It was.

(TR 48–49).

\*   \*   \*   \*   \*   \*

A. At that time we just take them in order as they come. His number, we do not pass over, or we do not skip over them.

(TR 76).

\*   \*   \*   \*   \*   \*

Q. You would go through and select six men in class I–A and one person that was classified as I–O.

A. Provided he fell in order. We did not reach and get him, he had to fall in sequence, he had to fall in order.

Q. And you followed that procedure, notwithstanding the notice from the Selective Service System only asked for a I–A, is that right, is that right?

A. That's right.

(TR 78).

\*   \*   \*   \*   \*   \*

A. No, we would not substitute, we went right down the line in order, he had to fall in sequence. We took the oldest man's date of birth and when we came to him and he was a I–O, he was ordered to work in lieu of induction, but he was not pulled out of order.

1967 and into IV–D some nine months later (Douglas Lee) was born in 1949 and was therefore *younger* than Johnson. The jury, however, was unaware of this fact. Of course, we have not assumed to

(TR 79).

\*   \*   \*   \*   \*   \*

Q. Now its true isn't it that the relationship of the Defendant's civil rights activities passed to his selective service status is the question of whether or not he ought to be placed in classification of I–AO, so he could be inducted in the next call isn't that right?

A. If that was in sequence, if that was in sequence he would not have been called at all unless he was in sequence.

(TR 96).

\*   \*   \*   \*   \*   \*

Q. And your purpose here was to arrange, to organize the early induction of the registrant was it not?

A. Oh no indeed, we did not arrange the early induction of the registrant.

Q. But if he had been classify as I–AO—

A. He would have been ordered just like any other registrant, in sequence.

(TR 96).

\*   \*   \*   \*   \*   \*

Q. But there were older registrant who had been found accepted?

A. Not in class I–O.

Q. What about in class I–AO or I–A?

A. I would have to go back and check my records, but as far as I can remember there were none.

(TR 101).

\*   \*   \*   \*   \*   \*

A. We have available pool of I–A men and when we receive a call at that time we take the oldest one first and come right down the line in sequence, and that is the way we would do.

evaluate this or in any way consider it as to Johnson's attack. But he cannot complain in that we recite since the record before the jury presented a picture much more helpful to him.

(TR 101).

\* \* \* \* \* \*

A. When we reached him we ordered him in order.

(TR 102).

At this point, it became a jury question. The jury could credit the Executive Secretary's testimony to the effect that Johnson was not taken out of order, or it could infer from the testimony about Dickman and the evidence of the letters in Johnson's file that the order to report for alternative service was not duly and lawfully issued. The trial Court carefully instructed the jury on this element of the offense, twice charging the jury that if the Government failed to carry its burden to prove beyond a reasonable doubt that Johnson's order to call was regular and lawful, it must acquit him.

"Now you will thus be called upon to decide, (1) as to whether or not the Defendant was called up ahead of older previously qualified conscientious objectors or was called in regular order in his classified category or not. The Defendant contends that he was called out of order and you will decide from the evidence in the case whether he was or was not called out of order. The burden of proof is upon the government to prove that he was not called out of order."

"I charge you that should you find from the evidence at the time the Defendant was ordered to report for civilian service as a conscientious objector that other registrants older than the Defendant and who were classified I–O and had been previously found acceptable were passed over that you must acquit the Defendant." [22]

Moreover, the charge did *not* include a presumptive instruction giv-ing the Government any advantage on this issue. The jury had to weigh the direct and circumstantial evidence and determine whether or not the Government had discharged its burden of proving, beyond a reasonable doubt, that Johnson had been taken in the proper sequence. They having done so and having found that the order of call was regular (as is inferentially manifest by the verdict) this Court will not set that jury verdict aside. It requires no citation of authority to hold that a jury, fully and properly instructed has the exclusive responsibility to resolve issues of fact created by conflicting evidence and inferences. Not only will appellate Judges not assume the roles of super-draft boards, super-school boards, super-prison administrators, or super-legislators, we are also constitutionally prohibited from anointment as super-jurors.

### Segregated Draft Boards

As a final substantive argument Johnson asserts that the exclusion of Blacks from local Selective Service Boards in Mississippi deprived him of due process of law in violation of the Fifth Amendment and 50 U.S.C.A. App. § 455(a). The record contains a stipulation that at no time during Johnson's lifetime has any member of the Black race served on Local Board No. 23 in Grenada, Mississippi, or on any of the Appellate Boards of the State of Mississippi.

Although we have withheld decision in this case awaiting action by this Court en banc in United States v. Lemmons, No. 29149; United States v. Adams, No. 30868; and Smith v. Leach, 5 Cir., 468 F.2d 624, as well as other cases consolidated therewith which have now been disposed of without reaching this question, the simple answer in Johnson's case

---

22. Of course, this instruction could have been worded more deftly to again place the burden clearly on the Government on this element, but in view of (i) the former instruction specifically placing the burden on the Government on this element and (ii) generally placing the burden on the Government on every issue, and (iii) in the absence of any objection to the manner in which this instruction was rephrased, the wording of this instruction did not constitute prejudicial error, if it was error.

is that Johnson can show no prejudice from the alleged discriminatory practices because he received from the Board the precise classification which he requested—I-O. This washes it all out. He has nothing to complain about because he got all that he asked for, could have received or could have wanted even if the draft board had been composed exclusively of members of his race.

Johnson also alleges that the judgment of conviction must be vacated by reason of the District Court's pronouncement of sentence immediately upon receipt of the jury verdict and the Court's refusal to have a presentence investigation conducted as the Defendant had specifically requested. Of course, so long as the sentence is within the statutory limits, we give very great if not controlling deference to the discretion of the trial Judge. Thomas v. United States, 5 Cir., 1966, 368 F.2d 941; Mount v. United States, 5 Cir., 1964, 333 F.2d 39, cert. denied, 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed.2d 175; Herman v. United States, 5 Cir., 1961, 289 F.2d 362, cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93. While it is not the function of this court to review the length of sentences imposed by district courts, it is observed that the appellant has served a substantial part of his period for alternate service. He expressly requested a pre-sentence report and gave some indication of his willingness to work in other Mississippi hospitals. The defendant was sentenced to the statutory maximum immediately after the jury returned its verdict. Under the provisions of Rule 35 F.R.Crim. P. the district court may reduce the sentence within 120 days after receipt by that court of a mandate issued upon affirmance of the judgment on appeal. Needless to say, the reduction of a valid sentence after affirmance is within the discretion of the trial court. Substantial time has elapsed since the appellant was sentenced. Considerations based on compassion and mercy are to be determined by the trial court. We are confident that the distinguished trial judge in this case will give due consideration to all legitimate factors to be considered if a reduction in sentence is sought. See Lott v. United States, 5 Cir., 1962, 309 F.2d 115, 126.

AFFIRMED.