**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Adrian CUESTA, a/k/a "Andy" Cuesta, Gloria Ophelia Patterson, Eddie R. Callahan, Anthony George Lopez, Jr., John T. Bowles, a/k/a J. T. Bowles, Leo Matassini, Defendants-Appellants.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**William L. TAYLOR, Gloria Ophelia Patterson, Anthony George Lopez, Jr., Eddie R. Callahan, Defendants-Appellants.**

Nos. 77–5510, 77–5522.

United States Court of Appeals, Fifth Circuit.

June 25, 1979.

Rehearings Denied Aug. 13, 1979.

Richard Lazzara, Tampa, Fla. (Court-Appointed), for Cuesta.

Bennie Lazzara, Jr., Tampa, Fla. (Court-Appointed), for Bowles.

Nicholas M. Matassini, Tampa, Fla. (Court-Appointed), for Matassini.

Arthur N. Eggers, Tampa, Fla. (Court-Appointed), for Taylor.

Anthony F. Gonzalez, Tampa, Fla., for Patterson.

Joseph H. Ficarrotta, Tampa, Fla. (Court-Appointed), for Lopez, Jr.

James R. Yon, Tampa, Fla., for Callahan.

Gary L. Betz, U. S. Atty., Jacksonville, Fla., Andrew S. Gordon, c/o T. George Gilinsky, William G. Otis, Washington D. C., for plaintiff-appellee.

Before GOLDBERG, Circuit Judge, SKELTON *, Senior Judge, and FAY, Circuit Judge.

FAY, Circuit Judge:

These two cases come before us on appeal from the United States District Court, Middle District of Florida. Count I of the ten count indictment charged all appellants except William Taylor, with conspiracy to possess and distribute narcotics, in violation of 21 U.S.C. §§ 846 and 841(a) (1976). Count I was the subject of trial in No. 77–5510.

Count II charged appellants Callahan, Lopez, Matassini, Patterson and Taylor with conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 371, 1503 and 1510 (1976). Counts III through X alleged false declarations before a grand jury, in violation of 18 U.S.C. § 1623 (1976); Lopez was charged in Count III, Patterson in Count IV, Callahan in Counts V, VI, and VII, and Taylor in Counts VIII, IX and X. Counts II through X were the subject of trial in No. 77–5522.

Following consecutive jury trials, appellants were convicted as follows: John T. Bowles, Count I; Callahan, Counts I, II, V, VI and VII; Cuesta, Count I; Lauro,[1] Count I; Lopez, Counts I, II, and III; Matassini,[2] Count I; Patterson, Counts I, II and IV; Taylor,[3] Counts II, VIII and X.

Each appellant has filed a brief in this court urging reversal on multiple grounds. Pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, each appellant has adopted the arguments advanced by each co-appellant. For reasons stated herein, we affirm these convictions.

## THE FACTS

### I. *The Marijuana Conspiracy*

The nature of the alleged conspiracies and the claimed errors requires us to set forth the facts in unusual detail.

The evidence against appellants in the two trials consisted primarily of testimony by Carl Swartz, a confidential informant for the FBI, and taped recordings of conversations among the appellants. Viewing the evidence in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence reveals that on February 25, 1976, Carl Swartz came to Tampa from Fort Myers. On that day, he visited the office of Callahan Bail Bonds where he saw appellants Lopez and Patterson, and met appellant Callahan for the first time.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. Lauro does not here appeal his conviction.

2. The trial of Pasquale Matassini on Count II was severed from that of his co-indictees. Matassini was subsequently acquitted of that charge.

3. Taylor was acquitted on Count IX.

In early March, while Swartz, Callahan and another man were at a restaurant, appellant Bryant Bowles approached Swartz and introduced himself. After Swartz' companions had departed, Bryant Bowles asked Swartz if he could "move" two hundred pounds of marijuana which Bryant added would arrive in two weeks. Swartz indicated that he thought he could move the marijuana, but first wanted to check. After obtaining assurances from Callahan that it was safe to deal with Bryant, Swartz informed Lopez of his conversation with Bryant and asked if "we could move it." Lopez indicated that the marijuana could be "moved," noting that the asking price of $300 per pound was too high, but confident that the price would come down after the dealing began.

Later that day, Swartz informed Bryant Bowles that he had spoken to someone who Bryant knew, and indicated that that person said there would be no problem moving the marijuana. Bryant asked if the person Swartz was referring to worked at Callahan's office. Bryant responded "You have no problems" when Swartz answered his question in the affirmative. In addition, Bryant indicated that his brother, J. T. Bowles, would be buying the drugs within two weeks.

During the next week, Swartz met with Bryant almost every day. At one of those meetings, Bryant explained that the marijuana would be flown in from Columbia to the Lake Okeechobee area and then brought to Tampa by truck. During this time, Swartz had several general discussions with Lopez regarding the impending deal with Bryant. Lopez reiterated that they would have no problem disposing of the marijuana. Over the weekend Bryant travelled to Fort Myers with Swartz, and had several discussions with him concerning the marijuana deal, including references by Bryant to the fact that his brother, J. T., would be bringing the drugs into the country.

Upon returning from the weekend in Fort Myers, Swartz again discussed the marijuana with Lopez. Lopez said that they should get the price lowered and that Swartz should tell Bryant that he (Lopez) thought the price was too high. Swartz then met with Bryant and, after some negotiation, Bryant reduced the price to $275 per pound.

In the early part of April, Swartz lost touch with Bryant, but he was able to arrange a meeting with J. T. Bowles. J. T. revealed that he knew of Swartz' deal with Bryant and was willing to continue with it. In addition, J. T. said that he would be bringing in 1,000 pounds of marijuana at least every week and hopefully every four to five days. The price for dealing directly with J. T. would be $225 per pound. Swartz informed J. T. that Lopez was his partner. J. T., while approving of Lopez, said that he preferred to deal with Swartz directly.

Swartz in turn told Lopez of the possibility of obtaining 1,000 pounds at $225 per pound. Lopez told Swartz to stay in touch and that the price would come down even more when they saw the money. Lopez asked Swartz to arrange a meeting with J. T. so that they could negotiate a lower price, obtain a sample of the marijuana and arrange for the airplane which J. T. needed to import the marijuana.

During this same time, Lopez was attempting to line up other sources of marijuana. On April 6, 1976, appellants Cuesta and Matassini told Lopez that they could obtain 10,000 pounds of marijuana at $225 per pound, but that they had no outlets. All parties then readily agreed to attempt the transaction and split the profits equally.

By April 22, however, Lopez had still been unable to obtain marijuana. Callahan advised Lopez to deal directly with Harry "the Rock" Hoffman and offered to put Lopez in touch with Hoffman.

On April 23, Lopez had a discussion with Patterson at the bond office. Lopez told of the possible deal with the Bowles brothers for 1,000 pounds and Patterson replied, "We know what to do with it". Lopez also mentioned that Swartz was trying to get a half-pound sample which Lopez would give to Patterson.

Thereafter, J. T. arrived at the bond office. His son brought in a sample of marijuana and gave it to Swartz who, in turn, gave it to Lopez for checking. The next day Lopez told Swartz that the marijuana was good. Patterson confirmed that "the stuff was terrific".

The following day, J. T., Lopez, and Swartz discussed the quality of the drugs and Lopez' offer to supply the plane. J. T. agreed to a price of $185 per pound if Lopez provided the plane. J. T. also mentioned that he had 15 kilograms of cocaine which would be imported with the marijuana. Lopez expressed interest in the cocaine and indicated that he would pay up to $7,000 per kilo. After J. T. left, Lopez told Swartz that everything sounded good, especially the cocaine, and that he would try to get a plane. Lopez discussed with Patterson the possibilities for obtaining a plane, but neither one could find someone willing to loan them the proper type of aircraft.

At about this same time (the middle to latter part of April 1976), appellant Lauro approached Swartz and J. T. at a table in Lopez' bottle club. Lauro asked Swartz if J. T. was the person bringing the "stuff" in and if he (Lauro) "could get in on the action". Swartz referred Lauro to Lopez, and the next morning Lopez told Swartz that they could use Lauro as a driver for $10 per pound.

J. T. told Swartz that he was going to Miami and then to Columbia to complete the arrangements. Swartz did not see J. T. again for about a week. During that week Bryant stayed at Swartz' home. During his stay, Bryant attempted to revive their prior deal for 200 pounds of marijuana. Lopez told Swartz they could still move the 200 pounds for Bryant, but it would be more difficult because of the higher price. Lopez also explained to Swartz that they could do the entire operation themselves, including the importation, but that by dealing through J. T. they would "pay a little more . . . but we don't take no chances."

On May 6, 1976, Lopez told Patterson that it appeared that the deal with J. T. was going to "come off." Lopez' optimism was based on the fact that Swartz had obtained a bank loan to finance the purchase of a plane and that soon J. T. was going to take the aircraft for a dry run. During this conversation with Patterson, Lopez explained that he was trying to help Cuesta and Matassini who were having trouble operating their drug business. Lopez said that he would not talk to either Cuesta or Matassini alone, since they apparently were partners. In spite of this, Lopez spoke to Cuesta and mentioned that the dry run would take place the following day.

On May 12, J. T. reappeared and told Swartz that he had just returned from Columbia. According to J. T., the first "load" would arrive within a week to ten days. Swartz was to receive the second load since the first load had been promised to others. Upon learning that J. T. had returned, Callahan asked Swartz to put him in touch with J. T. Swartz called J. T. and turned the phone over to Callahan. Callahan asked J. T. for the money he owed him and said that if he would "get moving on this deal" he would soon have the money to repay.

Two days later Lopez met with Cuesta and told him that Swartz was promised the second load of 1,000 pounds which was to arrive the following Wednesday. Lopez also mentioned Callahan's part in urging J. T. to stop delaying the shipment. Lopez and Cuesta discussed their inability to obtain sufficient supplies of drugs and expressed their satisfaction with the possibility of dealing regularly with J. T. through Swartz.

On May 17, Lopez and J. T. met to discuss the upcoming transaction. J. T. explained his problems in getting a plane and preparing it for the trip. A final price of $225 per pound was agreed upon. The two discussed the potential for regular shipments. Lopez stated that he would not "go around" Swartz, but that J. T. should tell Swartz when the shipment has arrived and Swartz would communicate that fact to Lopez. At this time J. T. hoped the shipment would arrive within two to three days.

With the transaction soon to occur, Lopez began to arrange financing. Swartz was

present when Lopez telephoned two persons in an effort to obtain the necessary funds. Swartz heard Lopez ask one person for $80,-000 and another for $70,000. After making the calls, Lopez told Swartz that both persons had agreed to supply the requested amounts and that they could pick it up at any time.

On June 14, 1976, Swartz met with J. T. J. T. related that the first "load" had arrived, that the plane was paid for, and that the next "load" would go to Swartz and Lopez. Swartz went home and telephoned Lopez to report the results of his meeting and related that they would receive a 700 pound shipment the following week.

In a telephone conversation with Lopez on June 20, Swartz related that "our man's down there" and that he would be bringing back the "tomatoes." Lopez expressed his approval and admonished Swartz to "keep close."

Appellants' planned importation never succeeded, however, because it was intercepted by DEA surveillance. Special Agent John Stevenson, a DEA pilot, testified that while airborne in a helicopter near Fort Lauderdale on June 21, he and his partner observed a Piper Aztec being followed by a customs plane. Stevenson observed the Piper land on a grass landing strip located in a sparsely populated area. There was a pickup truck at one end of the landing, and two individuals were seen moving around the plane. When Stevenson observed the truck beginning to leave, he landed the helicopter so that it blocked the truck from leaving. Upon approaching the plane, Stevenson saw three persons, one of whom he identified as Bryant Bowles. Within a few minutes, a customs plane piloted by John Warr arrived. Warr looked in the Piper Aztec, smelled marijuana and saw thirteen burlap covered bales of the contraband. Later tests revealed that the plane contained 682½ pounds of marijuana.

## II. *The Conspiracy To Obstruct Justice*

Immediately upon his arrival in Tampa in late February, 1976, Carl Swartz became a frequent visitor at the Callahan bail bond business. Swartz noticed that appellant Taylor, then a special investigator for the Florida State Attorney's Office, often came to see Callahan and that the two would have private conversations in Callahan's office. On March 14, Callahan told Swartz that Taylor had discovered Carl Caccamo was a government "stool pigeon," and that everyone should be careful because "the heat was going to come down." Callahan had been close to Caccamo and was disturbed that Caccamo had obtained his release from custody by promising to inform on Callahan and others. Callahan remarked that he considered Caccamo a "dead man."

Swartz, Lopez and Patterson were present at the bond office on March 23, when Callahan told them not to use the office telephones for "any kind of business," because Taylor thought that the phones were tapped.

By early April, Callahan's fear that Caccamo was an informant had deepened. Two judges had told Callahan to be careful of Caccamo and Callahan had his own men checking on Caccamo's activities. Callahan had also received information that Caccamo had caused the recent arrests of Matassini and Cuesta. Callahan noted that Lopez had "a couple dago boys" who were going to break Caccamo's legs and mouth so that he would be unable to talk.

On April 8, 1976, Callahan and Lopez questioned Matassini in an effort to determine if Caccamo had been responsible for his arrest, but Matassini had never heard of Caccamo. Callahan expressed his distrust of Caccamo, stating that he was an undercover agent for both the FBI and the Florida State Attorney's Office. On this same day, Lopez testified before the grand jury that he not only had never sold drugs of any kind, but had never even discussed the possibility of transactions involving marijuana.

About three weeks later, Patterson and Lopez were present in the bond office when Taylor arrived. A general discussion regarding the grand jury investigation en-

sued. Lopez wondered why the grand jury was interested in him, and Taylor replied that the government thought he was involved in illegal activities. Caccamo was viewed as the culprit.

The next afternoon, Callahan told Taylor that Caccamo was in Virginia. Taylor replied that he was probably with an FBI agent since he had gone there with one. Taylor was convinced that somebody would "get" Caccamo and believed that Caccamo was responsible for both Callahan and Lopez having been called before the grand jury. According to Taylor, the "Feds" thought Lopez was selling cocaine.

The possibility that Carl Caccamo was a government informant continued to plague Callahan and Lopez. Callahan was disturbed that an FBI agent who had been around the bond office had disappeared at the same time Caccamo left town. Callahan also learned that a number of criminal charges pending against Caccamo had been dismissed. When Callahan declared that he would not see Caccamo except to secure repayment of some debts, Lopez cautioned that they should be careful to conceal their knowledge of Caccamo's status as an informant. In Lopez' words, "Don't ever let an informant know [that you know] he's an informant unless you're gonna kill him."

Several days later, Callahan went to dinner with Swartz and his wife. During the meal, Pat Matassini visited the table and a discussion ensued centering on Caccamo. Both Matassini and Callahan expressed dislike for Caccamo. Callahan told Matassini that everything was "set for Saturday"; Matassini replied, "Fine." After Matassini left, Callahan explained that on Saturday he was taking Caccamo for dinner at a Chinese restaurant where Matassini would shoot him to death. Later, after Callahan had left, Swartz made a deal with Matassini whereby, if Swartz caught up with Caccamo first, he would receive a half of the contract price being paid to Matassini for the murder.

At about this time, appellants became increasingly concerned about the grand jury. On May 17, Callahan expressed apprehension about Laura Brannen, one of his employees, because "She knows my life from A to Z." Callahan's approach to Brannen about her prospective grand jury appearance was not subtle:

CALLAHAN: You don't know nothin' do you honey?

BRANNEN: No, I don't know anything.

CALLAHAN: You better not.

BRANNEN: I don't know nothin'.

CALLAHAN: You wanta live long enough to tell me how much you love me or whatever.

The next afternoon Lopez counseled Swartz on how he should respond if questioned by the grand jury. Lopez told Swartz to answer the nonincriminating questions, but to invoke the Fifth Amendment if they "hit a sore spot." According to Lopez, the government could then offer immunity and Swartz would have to answer.

A short while later, Taylor telephoned Callahan to report that he (Taylor) had been subpoenaed by the grand jury. Taylor arrived at the bond office about half an hour later. He and Callahan speculated about the reason for their having been subpoenaed to testify. Taylor thought that, possibly, he had told Callahan that Caccamo was a federal informant over a telephone line which had been tapped.

On June 16, 1976, Patterson told Lopez to tell Callahan she would reveal all that she knew. Lopez told her to be quiet and to testify that, to her knowledge, he (Lopez) was not involved in any illegal activity.

The prior plan to kill Caccamo having failed, Swartz and Callahan visited Caccamo's girlfriend. Callahan told her that he wanted to see Caccamo within 24 hours—he wanted the money and the ring he had loaned to Caccamo. During the ride back Callahan vowed that he would break both of Caccamo's legs. He was also going to tell Pat Matassini that Caccamo was nearby.

Patterson appeared before the grand jury on August 17, 1976. She denied knowing of Lopez' narcotics activities, ever discussing

with Lopez the importation or distribution of marijuana, or offering to obtain a pilot for Lopez.

The following morning, Swartz drove Callahan to his lawyer's office to prepare for Callahan's grand jury appearance. In his testimony before the grand jury, Callahan denied any knowledge of Lopez' narcotics activities, stated that he never offered to contact Harry "the Rock" Hoffman for Lopez in order to facilitate a narcotics transaction, and denied having threatened Caccamo with physical violence. Swartz drove Callahan back to the office after his appearance. When they arrived Callahan swore that he would kill Caccamo.

Later that same day, Taylor was summoned before the grand jury. Taylor testified that he never told anyone that the grand jury was investigating Lopez' narcotics activities and denied having made the statement that somebody will kill Caccamo.

That night Swartz took Callahan to visit Lopez and they discussed the testimony Callahan had given. Taylor telephoned Lopez and they also compared grand jury testimony.

The following day, Lopez cautioned Swartz to be sure to have an attorney if he was subpoenaed and to forget everything about their aborted marijuana transaction and the meetings they had with J. T.

On August 25, 1976, Swartz, while fitted with a body microphone and tape recorder, spoke to Callahan regarding Caccamo. Callahan expressed his overriding desire to kill Caccamo regardless of whether he himself were to be imprisoned or executed for the murder. Callahan blamed Caccamo for placing a "bug" in his office, because it was only through such a device that the government could have learned that Taylor told Callahan that Caccamo was an informant. Throughout the remainder of August, Callahan, in his daily contacts with Swartz, continued to refer to informant Caccamo as the cause of their problems.

On September 14, Swartz had one last meeting with Lopez in which Lopez emphasized that, as long as neither one of them testified, no case could be made against them.

## THE LAW

### I. INTERCEPTED COMMUNICATIONS

■ The paramount issue of these appeals deals with the propriety of certain language contained in the Title III wire tap order. The bulk of the government's cases against these individuals stems from recordings of their conversations.

On March 31, 1976, Judge Hodges of the United States District Court, Middle District of Florida, signed an order authorizing interception of oral communications based upon an application and an affidavit in support of the application. Pursuant to that order, interception of communications at Callahan's Bail Bonds began on April 1, 1976. Subsequently, two extension orders were granted based on information developed from the intercepted communications. The interception was conducted after the installation of two in-office listening devices in the telephones at Callahan's business office. Interception of communications at Callahan's Bail Bonds continued until May 26, 1976.

All appellants urge that the trial court erred in not granting their motion to suppress these communications. In particular, appellants claim that the order authorizing the placement of listening devices in the Bail Bond office, which by its terms authorized surreptitious entry for the purpose of installing, maintaining and removing these devices, was too broad in that the order failed to give guidelines to be followed in such entries. This resulted, appellants argue, in an unconstitutional abdication of judicial control and supervision by allowing prosecutorial and investigative personnel to determine their Fourth Amendment rights.

We have held these matters in abeyance pending the Supreme Court's ruling in *Dalia v. United States*, —— U.S. ——, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), as all parties agreed this resolution would probable provide the controlling authority. The Supreme Court has now spoken and specifically rejected appellants' contentions.

The petitioner in *Dalia* raised the same issues as appellants here. The Court in clear direct language disposes of all of these contentions. It rejects any basis for a constitutional rule proscribing covert entries. The Court recognized that while

"Title III does not refer explicitly to covert entry. The language, structure, and history of the statute, however, demonstrate that Congress meant to authorize courts—in certain specified circumstances—to approve electronic surveillance without limitation on the means necessary to its accomplishment, so long as they are reasonable under the circumstances,"

—— U.S. at ——, 99 S.Ct. at 1689, and then concluded:

"We make explicit, therefore, what has long been implicit in our decisions dealing with this subject: The Fourth Amendment does not prohibit per se a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment."

*Id.*

The Supreme Court emphasizes that any other interpretation of Title III or 18 U.S.C. § 2518 would "thwart" the Congressional purpose. The opinion also rejects totally any notion that the warrant or order must set forth the procedures to be followed by the executing officers. It repeats that both bugging and wire-tapping forms of surveillance are covered by the procedures used *sub judice* and the receipt of evidence thereby obtained.

## II. JENCKS ACT

Agent Arwine testified that he met with Swartz on three occasions. Agent Kinne testified that he had almost daily contact with Swartz between February and September, 1976. Both agents took notes during the interviews from which they prepared memorandum reports. After preparing their memoranda, the agents destroyed their original notes.

Arwine stated that although he took notes during their meetings, he did not take down verbatim what Swartz had told him, he made no attempt to "get down the exact words" of Carl Swartz, and did not show these notes to Swartz nor read them back to Swartz in order to verify their accuracy.

Agent Kinne testified that he attempted to take accurate notes during his many interviews with Swartz. He noted that there may have been one or two occasions when he "put down a quotation," but that he never read back his notes to Swartz in order to verify their accuracy. When asked whether the memoranda which he prepared from his notes were ever used to prepare Swartz for his trial testimony, Kinne noted that the interviewing attorneys had used the memoranda "to refresh their recollection so that they could properly interview him." All appellants join in the assertion that the trial court committed reversible error in denying defense requests to order the government to produce these memoranda. Appellants claim that these were Jencks Act statements, discoverable under 18 U.S.C. § 3500(b) and (e)(2), which provide in relevant part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

(e) The term "statement", as used in subsection (b) . . . of this section in relation to any witness called by the United States, means—. . . (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

■ The district judge denied defendant's motion to order production of the memoranda and declined to screen the memos *in camera* finding that they were "not verbatim", but rather accurate "summaries" of the conversations with Swartz. The record shows that none of the reports were adopted or otherwise authenticated by the witness. As this Court has noted, "[i]nvestigators' notes of interviews do not fall under the [Jencks] Act even if they contain 'occasional verbatim recitations of phrases used by the person interviewed.'" *United States v. Hodges,* 556 F.2d 366, 368 (5th Cir.), *cert. denied,* 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1977), *quoting United States v. Cruz,* 478 F.2d 408, 413 (5th Cir. 1973). Moreover, whether the memoranda contain such substantially verbatim recitations as to bring the memoranda under the act is "a matter of fact within the discretion of the trial judge." *Id.* The testimony in the record is more than sufficient to support the district court's finding that the reports were unverified summaries and therefore not statements within the Jencks Act. *See United States v. Judon,* 581 F.2d 553, 554–556 (5th Cir. 1978) (FBI reports prepared from notes taken during interviews with witness, not producible under Jencks Act).

## III. TAPES AND TRANSCRIPTS

■ At trial, foundation for the admission of the tape recordings was provided by Agent Kinne, who directed the interception at the bond office, Agent Roberts, who was in charge of the Lopez telephone intercept, Agent Batley, who participated in the installation of the two microphones at the bond office, the agents who monitored the conversations and Agent Buresh, who as a frequent visitor to the bond office, provided some of the voice identifications.

Cuesta and Matassini urge that the government failed to establish an adequate foundation for admission of the tapes. In particular, Cuesta argues that the government failed to establish the accuracy of the tape recordings. Both Cuesta and Matassini assert that the government failed to adequately identify their voices on the tapes.

While this Court has rejected the adoption of "any formulistic standard to guide the admissibility of tapes and transcripts," *United States v. Greenfield,* 574 F.2d 305, 307 (5th Cir. 1978), we have noted that the party seeking introduction of a sound recording into evidence must "go forward with respect to the competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations in the relevant portions of the recording, and the identification of the relevant speakers." *United States v. Biggins,* 551 F.2d 64, 66 (5th Cir. 1977).

This burden has been met by the government. Both agents Kinne and Roberts testified that prior to the commencement of their respective surveillances, monitoring agents were instructed on the use of the recording machines. Agent Batley, technical coordinator for the Tampa Division of the FBI, testified that the monitoring agents all had experience in operating the equipment used on this case and that he personally instructed them on the use of the equipment. The monitoring agents also testified to having received instruction on the operation of the recording machines prior to commencement of the interceptions.

Agent Batley, who participated in the installation of the microphones in the bond office, testified that he tested the microphones by using a "lineman's test set," and that before any interception occurred, he tested the recording machines. Batley noted that the microphones and the recording machines were operating properly. Similarly, Batley described how he connected the Lopez telephone intercept and verified that he had, in fact, tapped the proper line. The Lopez tape recording machines were tested prior to their use by monitoring agents.

Two recording machines for each intercept were activated by a single switch. This set-up allowed for the simultaneous recording of two sets of tapes. Logs were maintained by the monitoring agents as the

conversations were taking place. Agent Kinne compared these logs with the tapes in order to verify the accuracy of the tapes. In addition, one copy of each original was sealed by the court. The duplicate tape was used to prepare the trial tape. Kinne testified that he compared the trial tape to the duplicate in a check for accuracy.

The agents responsible for making and maintaining custody of the tapes testified that they were not altered or edited except to the extent that certain portions were chosen for the trial tape. Moreover, it appears that appellants used the tapes at trial to play additional portions of the tapes which were not played by the government. Coupled with our resolution of the voice identification issue set forth below, we hold that this evidence met the government's burden as outlined in *Biggins* and the tapes were properly admissible.

■ Rule 901(b)(5) of the Federal Rules of Evidence provides that voice identification may be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." At trial, agent Buresh, who had been a frequent visitor to the bond office, identified the voices of Patterson, Lopez and Callahan based on his conversations with them. Kinne identified all the remaining appellants except J. T. Bowles based upon their references to each other by name and also upon personal interviews with appellants. J. T. Bowles identified himself during a telephone conversation made from the bond office. In addition, Kinne, who prepared the tape transcripts used at trial, also testified that his identification of particular parties on the transcript was based on observations of the traffic at the bond office and interviews with the appellants. No objection was made to the transcript identifications at trial.

■ These identifications were sufficient to sustain introduction of the tapes and transcripts at trial. Rule 901(b)(5) merely requires that the witness have some familiarity with the voice which he identifies. *See United States v. Ladd,* 527 F.2d 1341 (5th Cir. 1976). Once this minimal showing

has been made, the jury determines the weight to accord the identification testimony. *See United States v. Knohl,* 379 F.2d 427 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); *Pilcher v. United States,* 113 F. 248 (5th Cir. 1902). With or without objection, the substantial testimony identifying the voices of all appellants except J. T. Bowles, more than satisfies all legal requirements. J. T. provided his own identification.

## IV. COUNT I: SUFFICIENCY

■ J. T. Bowles argues that the evidence reveals the existence of at least five separate conspiracies, not the single conspiracy to import and distribute controlled substances as charged in Count I of the indictment. Based on this characterization of the evidence, Bowles urges that failure of the trial court to grant his motion for severance and for judgment of acquittal resulted in the transference of guilt amongst members of the various conspiracies to his detriment.

Matassini claims that the proof at trial showed a scheme significantly different from that charged in the indictment. Matassini notes that the indictment casts him and Cuesta in the role of purchaser, whereas the evidence showed they were suppliers. This, he urges, constitutes a fatal variance which should have resulted in the granting of his motion for judgment of acquittal for insufficiency of the evidence.

We have examined this lengthy record with respect to the evidence concerning each individual defendant and are convinced that there is ample evidence to support the conclusion that appellants charged in Count I conspired to participate in a common scheme aimed at the single purpose of possession and distribution of narcotics. As to Matassini's contention, the evidence showed that while he and Cuesta originally contemplated selling and/or distributing 10,000 pounds of marijuana to Lopez and Swartz, when Cuesta and Matassini had trouble obtaining adequate supplies of marijuana, they were more than willing to

make regular purchases from J. T. Bowles through Swartz. This evidence is certainly sufficient to sustain the charge of conspiracy.

## V. COUNT II: ADEQUACY, IMPOSSIBILITY, SUFFICIENCY

Count II charged Lopez, Callahan, Taylor, Patterson and Matassini with conspiracy to violate 18 U.S.C. §§ 1503 (obstruction of justice) and 1510 (obstruction of criminal investigations), in violation of 18 U.S.C.

4. Count II of the indictment reads:
COUNT TWO

From on or about January 1, 1976, and continuing to on or about the date of the return of this indictment, at Tampa, Florida, in the Middle District of Florida and elsewhere,
WILLIAM L. TAYLOR;
EDDIE R. CALLAHAN;
ANTHONY GEORGE LOPEZ, JR.,
a/k/a "Pico" Lopez;
PASQUALE MATASSINI, a/k/a
"Pat" Matassini; and
GLORIA OPHELIA PATTERSON
did willfully, knowingly, intentionally and unlawfully conspire, combine, confederate and agree together and with each other and with other persons both known and unknown to the Grand Jury, to commit an offense against the United States; that is, to violate Title 18, United States Code, Sections 1503 and 1510.

It was a part of said conspiracy that WILLIAM L. TAYLOR, EDDIE R. CALLAHAN and ANTHONY GEORGE LOPEZ, JR., a/k/a "Pico" Lopez, would corruptly endeavor to influence, intimidate and impede witnesses who were to appear before the Federal Grand Jury in Tampa, Florida.

It was a further part of said conspiracy that WILLIAM L. TAYLOR would advise EDDIE R. CALLAHAN of the identity of a confidential informant for the Federal Bureau of Investigation and that EDDIE R. CALLAHAN would arrange for PASQUALE MATASSINI, a/k/a "Pat" Matassini, to murder said informant.

It was a further part of said conspiracy that WILLIAM L. TAYLOR would disclose to EDDIE R. CALLAHAN the nature of investigations being conducted by the Federal Bureau of Investigation and the Federal Grand Jury in Tampa, Florida.

It was a further part of said conspiracy that WILLIAM L. TAYLOR, EDDIE R. CALLAHAN, ANTHONY GEORGE LOPEZ, JR., a/k/a "Pico" Lopez, and GLORIA OPHELIA PATTERSON would corruptly endeavor to influence, obstruct and impede the due administration of justice by discussing among themselves testimony to be given by each of them before the Federal Grand Jury in Tampa, Florida, and they knowingly agreed to make false declara-

§ 371. Count II charged two aspects of the conspiracy. First, Count II charged that Taylor, then a special investigator for the Florida State Attorney's Office, passed information to Callahan concerning federal investigations, including the fact that Carl Caccamo was a federal informant. Continuing, the count charged that Callahan attempted to arrange the murder of Caccamo. Second, it alleged that the conspirators agreed to give false testimony to the grand jury and withhold information.[4]

tions and to withhold information from said Grand Jury.

It was a further part of said conspiracy that ANTHONY GEORGE LOPEZ, JR., a/k/a "Pico" Lopez, would corruptly endeavor to influence, obstruct and impede the due administration of justice by instructing Carl Swartz to refuse to testify before the Federal Grand Jury in Tampa, Florida.

In furtherance of the conspiracy and to achieve and effect the objects of the conspiracy, at least one of the defendants committed at least one of the following overt acts:
OVERT ACTS

1. On or about March 14, 1976, WILLIAM L. TAYLOR advised EDDIE R. CALLAHAN at Callahan Bail Bonds in Tampa, Florida, that Carl Caccamo was a "stoolie" for the Federal Bureau of Investigation, and further advised EDDIE R. CALLAHAN to proceed with caution because, "The heat is going to come down."

2. On or about April 8, 1976, ANTHONY GEORGE LOPEZ, JR., a/k/a "Pico" Lopez, appeared before a Federal Grand Jury at Tampa, Florida, and concealed information by knowingly making false declarations, as charged in Count Three of this indictment, concerning his participation in drug trafficking.

3. On or about April 30, 1976, at Callahan Bail Bonds in Tampa, Florida, WILLIAM L. TAYLOR met with EDDIE R. CALLAHAN to advise him that "the Feds" were investigating "Pico" LOPEZ for dealing in cocaine.

4. On or about May 11, 1976, EDDIE R. CALLAHAN, and PASQUALE MATASSINI, a/k/a "Pat" Matassini, met at the Maison Rouge restaurant on Dale Mabry Highway, in Tampa, Florida, and planned to assassinate or "hit" Carl Caccamo.

5. On or about May 18, 1976, EDDIE R. CALLAHAN and WILLIAM L. TAYLOR met at Callahan Bail Bonds in Tampa, Florida and discussed the possibility of a "wire tap" on the telephone at that office, and how they would testify at their Federal Grand Jury appearance at Tampa, Florida.

6. On or about June 16, 1976, "Pico" LOPEZ had a telephone conversation with GLORIA OPHELIA PATTERSON in which he advised

## 1. *Adequacy*

Appellant Taylor contends that the district court erred in failing to grant his motion to dismiss Count II of the indictment on the grounds that the indictment failed to adequately describe many of the necessary elements of the offense. We cannot agree.

An indictment is sufficient if it "contains the elements of the offense intended to be charged," sufficiently appraises the defendant of the charges he must be prepared to meet, and safeguards the accused from possible double jeopardy. *Russel v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Martinez,* 496 F.2d 664, 669 (5th Cir.), *cert. denied,* 419 U.S. 1051, 95 S.Ct. 627, 42 L.Ed.2d 646 (1974). In that the essence of conspiracy is unlawful agreement rather than accomplishment of the unlawful objective, *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975),

> it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, . . . or to state such object with the detail which would be required in an indictment for committing the substantive offense.

*Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545 (1927) (citations omitted). *Accord, United States v. Evans,* 572 F.2d 455, 483 (5th Cir. 1978); *United States v. Fischetti,* 450 F.2d 34, 40 (5th Cir.), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1971); *Brown v. United States,* 403 F.2d 489 (5th Cir. 1968). All that is necessary in charging conspiracy is "certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit . . . ." *Williamson v. United States,* 207 U.S. 425, 447, 28 S.Ct. 163, 171, 52 L.Ed. 278 (1908); *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1926).

Count II meets and exceeds this standard. It alleges a common intent to frustrate the proceedings of the grand jury by arranging for the murder of a government informant, obstructing justice by supplying persons under investigation with inside information, and by agreeing to provide false testimony. Coupled with the eleven overt acts set forth in Count II, naming persons, times and places, appellants were specifically informed of the crimes forming the object of the conspiracy. Accordingly, appellants argument must fail as Count II sufficiently stated an offense.

## 2. *Impossibility*

As previously mentioned, one part of the conspiracy was the plan to murder Carl Caccamo, who was providing information to the government. Appellant Taylor claims that the government failed to prove that Caccamo was, in fact, an informant and therefore, his motion for a judgment of acquittal should have been granted. Appellant Taylor, however, misreads the statutes involved.

---

her to conceal and cover up his activities concerning the possession and distribution of controlled substances.

7. On or about July 15, 1976, EDDIE R. CALLAHAN traveled to the home of Carl Caccamo's girlfriend and told her to tell Carl Caccamo he had better contact him or he was going to "bust" Caccamo up with a baseball bat.

8. On or about August 17, 1976, GLORIA OPHELIA PATTERSON appeared before a Federal Grand Jury at Tampa, Florida, and concealed information by knowingly making false declarations, as charged in Count Four of this indictment, concerning her discussions with "Pico" LOPEZ.

9. On or about August 18, 1976, at Callahan Bail Bonds in Tampa, Florida, ANTHONY GEORGE LOPEZ, JR., a/k/a "Pico" Lopez, told Carl Swartz that if he was called before the Grand Jury in Tampa and asked about J. T. BOWLES, he should "keep his mouth shut."

10. On or about August 18, 1976, EDDIE R. CALLAHAN appeared before a Federal Grand Jury at Tampa, Florida, and concealed information by knowingly making false declarations, as charged in Counts Five through Seven of this indictment.

11. On or about August 18, 1976 WILLIAM L. TAYLOR appeared before a Federal Grand Jury at Tampa, Florida, and concealed information by knowingly making false declarations as charged in Counts Eight through Ten of this indictment.

All in violation of Title 18, United States Code, Section 371.

▮ Neither 18 U.S.C. §§ 1503 nor 1510 requires proof that the witness or source with whom interference is attempted be an informant. Adoption of appellant Taylor's limited interpretation of these statutes would frustrate the clear intent of the statutes—that is, to protect individuals assisting in a federal investigation or judicial proceeding. We hold that so long as the evidence showed Caccamo to be a source of information to the government, providing information to a "criminal investigator" as provided in 18 U.S.C. § 1510, or serving in a capacity as provided in 18 U.S.C. § 1503, a conspiracy to murder him fits squarely within the proscription of 18 U.S.C. § 1503 and 1510, as provided in the indictment.

### 3. *Sufficiency*

Appellants Taylor and Callahan contend that the government's evidence was insufficient to prove an agreement among those charged in Count II. We cannot agree.

▮ We note at the outset that the government is not required to prove the existence of an agreement by direct evidence. Ordinarily, the acts and conduct of the conspirators themselves provide relevant and competent circumstantial evidence of an agreement. *United States v. Evans,* 572 F.2d 455 (5th Cir. 1978). In addition, the government is not compelled to prove that a defendant was familiar with each and every detail of a conspiracy, but rather, that a defendant had knowledge of the agreement and associated with the plan in order to promote its success. *Id.* at 469.

▮ In this case, the testimony of Swartz and the appellants' own taped conversations show with unmistakable clarity that there was a plan and an association for the purpose of hindering the government's investigation. The plan did not take the form of one joint action but rather multiple actions for the purpose of achieving one overall objective. *See United States v. Perez,* 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1975).

The record reveals that Lopez, Patterson and Callahan were connected to the distribution conspiracy charged in Count I. Taylor, privy to investigative information through his position in the Florida State Attorney's Office, told Callahan that Caccamo was an informant for the FBI and that indictments would be forthcoming. Taylor also related that because of the information provided by Caccamo, most of the people from the bond office would be called before the grand jury. Taylor told Lopez that the government thought Lopez was dealing in cocaine. In addition, Taylor informed Callahan that his telephones were tapped.

Callahan responded to this information by hiring Pat Matassini to kill Caccamo in order to prevent Caccamo from giving further information to federal authorities regarding illegal activities at the bond office. Although the plan failed, it was not due to a lack of diligence in attempting to find Caccamo. Upon hearing of their impending grand jury appearances, appellants took action to ensure that any incriminating information would be withheld. Callahan cautioned both Lopez and Lauro Brannen to forget what they knew about him. Lopez told Swartz to refuse to answer when the grand jury "hit a sore spot." Lopez also told Swartz to forget about their dealings with J. T. Bowles, and told Patterson to testify that, to her knowledge, he was not involved in any illegal activity. Finally, Callahan, Taylor, Lopez and Patterson all gave false testimony regarding their knowledge of the conspiracy (marijuana and cocaine) and the attempts to kill Caccamo. In short, the government's evidence of the conspiracy charged in Count II was abundant, clear and convincing. This is a case where the "record fairly shrieks the guilt" of appellants charged in Count II. *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

## VI. SEVERANCE

Appellant Taylor urges that the trial court erred in denying his motion for a separate trial on Count II. Taylor, it must be recalled, was not charged with involve-

ment in the drug conspiracy. Rather, Taylor was tried in No. 77–5522 with conspiracy to obstruct justice and false declarations before a grand jury. Taylor asserts that he had no knowledge of his co-defendants drug activity and that a joint trial in which he was faced with proof of his co-defendants false declarations based upon unrelated criminal activities necessarily caused him prejudice.

Rule 14 of the Federal Rules of Criminal Procedure speaks to the issue of prejudicial joinder and is couched in terms which require a trial court to weigh the prejudice attendant to a joint trial against interests of judicial economy. Fed.R. Crim.P. 14. This balancing process, which requires severance of defendants or charges as the needs of justice dictate, is committed in the first instance to the sound discretion of the trial judge. *United States v. McLaurin,* 557 F.2d 1064, 1074–75 (5th Cir. 1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978). Absent a showing by defendant of abuse of that discretion, an appellate court will not substitute its own judgment for that of the lower court. *See Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

Taylor's trial was not unduly complex or lengthy. There were only three other defendants. The district court instructed the jury regarding the limited admissibility of co-conspirator statements and cautioned the jury, both before the playing of the tapes and during final instructions, to consider each count and the evidence against each defendant separately. Under these circumstances, we cannot find that the district court's denial of Taylor's motion for severance constituted an abuse of discretion.

## VII. TRUTH AND PERJURY

Taylor challenges his conviction for false declarations before a grand jury arguing that the statements upon which Count VIII was based were literally true. Taylor testified to the grand jury as follows:

BY MR. HOGUE:

Q. What about Pico Lopez?

A. Well I have certainly never interceded for Pico Lopez, sir, on any type of matter.

Q. You never passed on the fact that there was a Federal Grand Jury investigating his narcotics activities?

A. No, sir. Never. In fact, I have no knowledge that that has ever been a fact. But had I did (sic) have any knowledge to that effect I would certainly not pass it on to him or to anyone.

BY MR. JAMES:

Q. Well have you ever speculated to anyone that we were conducting an investigation into Pico's narcotics activities?

A. No, sir.

At trial, the government produced the following transcript of a conversation between appellant Taylor and Eddie Callahan at the Callahan Bail Bond office: [5]

Callahan: No, no more, listen, after awhile, I had, I mean I don't I don't want no part of the mother _____ (Caccamo).

Taylor: He's responsible for you bein' before that _____ Grand Jury.

Callahan: I imagine so.

Taylor: He's responsible for Pico being down there.

Callahan: Yeah.

Taylor: Let one tell ya somethin', now you can tell Pico this, they think he's dealing in _____ cocaine an' _____.

Callahan: Who?

Taylor: The feds.

Callahan: They uh, Pico—uh Carl Caccamo's runnin' cocaine?

Taylor: No, the feds think Pico is.

Callahan: Aw.

Taylor: Yeah, I'm tellin' you.

The essence of Taylor's appellate argument is that at no point did Taylor tell Callahan what the grand jury was investigating. Taylor explains the transcript by noting

---

5. We have used blanks as a substitute for the profanity which peppers these transcripts.

that the word "feds" could encompass numerous federal agencies and investigative bodies, whereas the questions which he answered before the grand jury only referred to the investigation of the grand jury.

▮▮ Taylor relies on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), to support his reasoning. In *Bronston*, the Supreme Court reversed appellants perjury conviction under 18 U.S.C. § 1621 where appellants grand jury answer was literally true, but unresponsive. The Court noted that the conviction would have to be reversed even if appellant intentionally misled his questioner by his answer and even if his answer is "false by negative implication." However, an answer that is responsive and false on its face does not come within *Bronston's* literal truth analysis simply because the defendant can postulate unstated premises of the question that would make his answer literally true. *United States v. Kehoe*, 562 F.2d 65, 68–69 (1st Cir. 1977). Similarly, *Bronston* does not deal with the situation where a defendant has given a "yes or no" answer, the truth of which can be ascertained only in the context of the question posed. *United States v. Chapin*, 169 U.S.App.D.C. 303, 309, 515 F.2d 1274, 1280 (1975). *Bronston* considered only the situation where a declarative statement made to a grand jury was true no matter what the context in which it was given.

▮▮ Appellant's *Bronston* analysis suffers from another serious flaw. In *Bronston*, the grand jury statement was non-responsive, deliberately misleading but true. In this case, appellant's grand jury testimony was responsive but deliberately false. Taylor alleges that his statement to Callahan about the "feds" is ambiguous. But this was a decision for the jury. Considering the context of the Taylor-Callahan conversation, the jury could reasonably conclude that Taylor related to Callahan that the federal grand jury was investigating Lopez' narcotics activity, that the appellant's answers before the grand jury were false beyond a reasonable doubt, and that defendant knew the answers to be false at the time he gave them. *See United States v. Parr*, 516 F.2d 458 (5th Cir. 1975).

## VIII. COUNT VIII—BILL OF PARTICULARS

During hearings on pre-trial motions, Taylor requested a bill of particulars, specifying those portions of the grand jury testimony forming the basis for Count VIII. Denial of the bill of particulars, Taylor asserts, constituted a denial of due process.

▮▮ The purpose of the bill of particulars is to sufficiently advise a defendant of the charges to enable him to prepare a defense and avoid surprise at trial, and to enable him to plead former jeopardy at a subsequent trial. *United States v. Cantu*, 557 F.2d 1173, 1178 (5th Cir. 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). The decision not to order a bill of particulars is within the discretion of the trial judge and will be overturned only upon a showing of clear abuse of discretion evidenced by actual surprise or other prejudice. *Id.*

▮▮ Taylor was clearly informed of the charges by the detailed language of the indictment which set forth his grand jury testimony. When Taylor inquired as to which portions of that testimony were alleged to be false, the government responded orally that all of the testimony was false. Taylor makes no claim of surprise, but merely concludes the "rambling" nature of his testimony worked to deprive him of due process. There can be no doubt that the subject matter of the offense was sufficiently described to allow him to plead former jeopardy in the event of a later prosecution. Where, as here, the indictment sets forth the false testimony, all of which was alleged to be false, there is no error in denying a motion for a bill of particulars.

## IX. COUNT IX—MATERIALITY

Appellant Taylor urges that the trial court erred in not granting his motion for a judgment of acquittal on Count X. While appellant concedes that his testimony was false, he now questions the materiality of the testimony.

Not every false statement is perjurious. In order for a false statement to be perjurious, it must be shown to be "material." The test for materiality is whether the false testimony was capable of influencing the tribunal on the issue before it. *United States v. Abrams,* 568 F.2d 411, 420 (5th Cir. 1978); *United States v. Brumley,* 560 F.2d 1268 (5th Cir. 1977). However, as we have recently noted, "the statements need not be material to any *particular* issue but may be material to any proper matter of inquiry." *United States v. Abrams,* 568 F.2d 411, 420 (5th Cir. 1978) (emphasis in original). This was amplified when we approved the following language from *United States v. Stone,* 429 F.2d 138, 140 (2d Cir. 1970):

> A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.

*Id.*

The grand jury testimony at issue here is:

Q. Did you ever tell Eddie Callahan that "somebody will get Carl Caccamo?"

A. Never.

The government's proof as to the falsity of this response was a taped conversation between appellant Taylor and Eddie Callahan, wherein they stated:

Callahan: Well, called his house an' wasn't there and uh he said he was gonna call my house, but he never did call my house, I haven't heard from the ⸻ period, the mother ⸻.

Taylor: Somebody'll get him.

Callahan: Huh?

Taylor: Somebody'll get him.

Callahan: Oh yeah. ⸻ yeah, you know there been rumbles goin' all over town. Whatever, you know. . . .

In addition to introducing these statements into evidence, the government presented testimony from an assistant United States attorney who participated in the grand jury investigation. He testified that the grand jury was conducting an investigation of Lopez' drug operation and possible obstruction of justice in connection with the investigation of Lopez. The questioning of Taylor specifically related to whether he had knowledge of efforts by others to obstruct both aspects of the investigation by preventing Caccamo from continuing to supply federal authorities with information. Clearly this was capable of influencing the grand jury by preventing further inquiry into the circumstances surrounding the threats to Caccamo. Taylor's motion for acquittal on Count X was, therefore, properly denied.

Appellant Taylor's final contention concerns the element of intent involved in false swearing. He argues that his motion for judgment of acquittal on Count X should have been granted because the government failed to prove that the false statement was knowingly and intentionally made. The issue of intent is to be decided from objective and circumstantial evidence. *Communications Association v. Douds,* 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950). Simply put, the jury did not buy Taylor's explanation of the circumstances. We will not disturb that finding.

## X. MATASSINI'S SENTENCE

Matassini contends that his sentence, although within the limits prescribed by statute, should be vacated by this Court exercising its supervisory power, because the sentence is more severe than that received by codefendants Cuesta and Lauro. Matassini's argument is based on the fact that the indictment cast all three in a similar role in the conspiracy. We reject this contention since the sentence is within the statutory limits and Matassini has demonstrated no abuse of discretion which would entitle him to relief. *See, e. g., United States v. Hayes,* 589 F.2d 811, 827 (5th Cir. 1979); *United States v. Deaton,* 477 F.2d 65 (5th Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); *United States v. Johnson,* 476 F.2d 1251, 1258 (5th Cir. 1973).

## CONCLUSION

Finding all the verdicts amply supported by sufficient evidence and the alleged er-

922

rors without merit, the convictions are affirmed.

Affirmed.